CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

AUG 09 2016

JULIA C. DUDLEY, CLERK
BY: H McDonog
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| RAHSAN DRAKEFORD, ) | Civil Action No. 7:15-cv-00253 | |
| Plaintiff, ) | | |
| ) | | |
| v. ) | **MEMORANDUM OPINION** | |
| ) | | |
| DR. MULLINS, et al., ) | By: Hon. Jackson L. Kiser | |
| Defendants. ) | Senior United States District Judge | |

Rahsan Drakeford, a Virginia inmate proceeding pro se, filed a civil rights action pursuant to 42 U.S.C. § 1983 about his conditions of confinement at Red Onion State Prison ("ROSP"). Plaintiff names Dr. Mullins and Nurse Scott, who are medical staff at ROSP, as defendants. Defendants filed a motion for summary judgment, and Plaintiff responded, making this matter ripe for disposition.[1]

Plaintiff complains that he hurt his wrist while on the recreation yard at ROSP on May 23, 2014. He feels that the medical treatments he received – assessments, treatments, medications, and surgery – violated the Eighth Amendment. Plaintiff takes particular issue with the use of Tylenol to treat his pain, Nurse Scott allegedly telling him he does not need medication, and the thirteen-day delay between when he broke his wrist and when he received surgery. Because the record does not support a finding of deliberate indifference, I grant Defendants' motion for summary judgment.

I.

On Friday, May 23, 2014, Dr. Mullins received a call that Plaintiff had injured his wrist. Dr. Mullins instructed that Plaintiff keep the wrist elevated above his heart, and Dr. Mullins ordered an ace wrap, an ice pack, an X ray, Motrin 800 m.g. by mouth immediately, and Motrin

---

[1] Plaintiff titled his response in part as a motion to strike, but since it does not ask for such unwarranted relief, I decline to construe it as such.

400 m.g. by mouth twice a day for five days. Dr. Mullins also ordered Plaintiff to be admitted into the medical department until seeing the X ray results.

Later that day, Dr. Mullins learned that the X ray revealed a fracture, and Dr. Mullins ordered a splint and an ice pack as needed for 24 hours. Dr. Mullins again instructed that Plaintiff's wrist be elevated above heart level.

Although not scheduled to do so, Dr. Mullins went to ROSP on Saturday, May 24, 2014, to review the X ray results and examine Plaintiff to ensure that someone saw him within twenty-four hours of the injury. The X ray showed an "acute comminuted fracture of the distal radius epiphyseal metaphyseal region." Dr. Mullins ordered staff to splint the wrist and schedule a consultation with an orthopedic specialist and instructed Plaintiff to keep the wrist above heart level. To treat pain, Dr. Mullins prescribed both "Tylenol #3" – which contains 300 m.g. of Tylenol and 30 m.g. of the narcotic codeine – four times a day and 800 m.g. of Ibuprofen three times a day for twenty-one days. Dr. Mullins prescribed both medications in case Plaintiff could not tolerate one of them, but Plaintiff could receive only one of the two medications.

Nurse Scott worked the night shift on May 24, 2014, and saw Plaintiff at 6:30 p.m. for his complaints of "throbbing." Nurse Scott reviewed the chart and read that the prior duty nurse had given Tylenol #3 to Plaintiff at 3:20 p.m.[2] Nurse Scott did not administer pain medication at that time because it was too soon since Plaintiff received his last dose, which Nurse Scott argues is

---

[2] The electronic medication administration record ("MAR") shows this dose as being administered at 4:16 p.m. Nurse Scott explains that for medications set upon the electronic system, the time on the electronic MAR shows the time when the nurse was able to get to the computer to log in the dose, and the actual time the dose was administered is what is reflected in the contemporaneous hand written notes in the chart and the handwritten Controlled Medication Administration and Count sheet.

2

very different from "refusing" to provide him with ordered medication.[3] Nurse Scott denies ever telling Plaintiff that he did not need to be medicated.

Nurse Scott saw Plaintiff again at 9:15 p.m. Plaintiff complained that his wrist hurt, Nurse Scott gave Tylenol #3 to Plaintiff, and Nurse Scott did not receive further complaints from Plaintiff that night.

Nurse Scott examined Plaintiff next at 6:15 p.m. on May 25, 2014, which revealed no distress, and Plaintiff did not complain of pain at that time. Plaintiff's medical record informed Nurse Scott that Plaintiff had received Tylenol #3 at 4:20 p.m.

By 9:15 p.m., Plaintiff complained that his wrist began to hurt again, and Nurse Scott gave him Tylenol #3. Nurse Scott did not interact with Plaintiff for the remainder of the shift and would not return to ROSP until May 31, 2014. Other medical staff continued to dispense Plaintiff's medication, however.

Dr. Mullins saw Plaintiff again on Tuesday, May 27, 2014. Dr. Mullins noted that the medical staff was trying to schedule an orthopedic consultation that same day. Dr. Mullins renewed the Tylenol #3 for four times a day.

Dr. Mullins saw Plaintiff again on Thursday, May 29, 2014. Dr. Mullins noted that arrangements had been made for him to see an orthopedic specialist on Monday, June 2, 2014. Dr. Mullins noted that Plaintiff was doing well at that time. Dr. Mullins personally contacted the orthopedic office to make sure they were aware of the date of injury and the X ray findings and

---

[3] As a result of the medical evaluation, Nurse Scott noted that Plaintiff was alert and oriented to time, place and person; his respirations were even and unlabored; his gait was steady; and his left hand was suspended from the waistband of his pants at hip level. Nurse Scott encouraged Plaintiff to keep his left hand elevated above his heart to help with the throbbing, as Dr. Mullins ordered. Nurse Scott noted that he would continue to monitor Plaintiff.

diagnosis, and the orthopedic office did not make any recommendations at that time or move up the appointment.

On May 30, 2014, Dr. Mullins was advised that the order for Tylenol #3 had expired, and Dr. Mullins ordered prescription strength Ibuprofen 800 m.g. three times a day for pain. Dr. Mullins did not renew Tylenol #3 because of the risks of dependency to codeine. Dr. Mullins received a call later that evening that Plaintiff was complaining about pain, so Dr. Mullins ordered one tablet of Tylenol #3 to be given that one time to better manage the pain.

At 6:15p.m. on May 31, 2014, Nurse Scott examined Plaintiff, who made no complaints and did not appear in distress. By 10:45 p.m., Plaintiff's wrist was hurting him, and Nurse Scott gave 600 m.g. of Ibuprofen to Plaintiff. Nurse Scott did not interact with Plaintiff for the rest of the shift.

At 6:45 p.m. on June 1, Nurse Scott examined Plaintiff, who did not appear to be in distress after having had received his evening dose of medication. Nurse Scott checked him again at 12:30 a.m. on June 2 during that same night shift. Plaintiff accepted his bedtime dose of medication, and Nurse Scott had no further involvement with Plaintiff.

Plaintiff saw the orthopedic specialist on Monday, June 2, 2014. The orthopedic specialist told Plaintiff to come back the next day to see a different doctor because he was retiring that same day. The orthopedic specialist did not recommend any change in medications.

Dr. Mullins was concerned about a potential for delay in having him go back to the office just to schedule the surgery, so on Tuesday, June 3, 2014, Dr. Mullins intervened and contacted a doctor at the Medical College of Virginia to schedule the patient's surgery for Thursday, June 5,

2014. Plaintiff was delivered to the MCV emergency room and underwent surgery on June 5 and afterwards was transferred to Sussex I State Prison for post-operative care.

## II.
### A.

Defendants filed motions for summary judgment seeking qualified immunity. A government official sued under § 1983 is entitled to invoke qualified immunity, which is more than a mere defense to liability; it is immunity from suit itself. Cooper v. Sheehan, 735 F.3d 153, 158 (4th Cir. 2013) (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). "The doctrine of qualified immunity 'balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).

The "qualified immunity analysis typically involves two inquiries: (1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." Raub v. Campbell, 785 F.3d 876, 881 (4th Cir. 2015). A "court may address these two questions in the order . . . that will best facilitate the fair and efficient disposition of each case." Estate of Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 898 (4th Cir. 2016) (internal quotation marks omitted). A plaintiff's claim "survives summary judgment, however, only if [the court] answer[s] both questions in the affirmative." Id.

A party is entitled to summary judgment if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a); see Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (recognizing a

party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant). "Material facts" are those facts necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts that demonstrate the existence of a genuine dispute of fact for trial. Id. at 322-24. A court may not resolve disputed facts, weigh the evidence, or make determinations of credibility. Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995); Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Instead, a court accepts as true the evidence of the non-moving party and resolves all internal conflicts and inferences in the non-moving party's favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).

## B.

Plaintiff fails to establish Dr. Mullins' or Nurse Scott's deliberate indifference. A plaintiff must show that a defendant acted with deliberate indifference to a serious medical need to state a claim under the Eighth Amendment for the unconstitutional denial of medical assistance.[4] Estelle v. Gamble, 429 U.S. 97, 104 (1976). Deliberate indifference requires a state actor to have been personally aware of facts indicating a substantial risk of serious harm, and the

---

[4] The court finds that Plaintiff's injury constitutes a "serious medical need." See, e.g., Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008).

6

actor must have actually recognized the existence of such a risk. Farmer v. Brennan, 511 U.S. 825, 838 (1994). "Deliberate indifference may be demonstrated by either actual intent or reckless disregard." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990); see Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) ("[T]he evidence must show that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'"). For example, an official evinces deliberate indifference by acting intentionally to delay or deny a prisoner's access to adequate medical care or by ignoring an inmate's known serious medical needs. See, e.g., Estelle, 429 U.S. at 104-05;, 238 F.3d 567, 576 (4th Cir. 2001). "A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position." Miltier, 896 F.2d at 851-52. A health care provider may be deliberately indifferent when the treatment provided is so grossly incompetent, inadequate, or excessive as to shock the conscience or is intolerable to fundamental fairness. Id. at 851.

There is no evidence that Dr. Mullins intentionally delayed Plaintiff's access to necessary medical care. Dr. Mullins ordered the orthopedic consult within twenty-four hours of the injury and that consult occurred within four business days of Dr. Mullins' order. During this time, Dr. Mullins personally contacted the orthopedic office to make sure they were aware of the X ray result and Plaintiff's condition to see if any additional treatment or quicker action was necessary. He also ordered pain medication, monitoring, an ACE wrap, elevation of the injury, and ice. In Dr. Mullins' medical judgment, Plaintiff's injury was not an "emergency" and did not warrant a trip to the emergency room at that time because Dr. Mullins had already obtained an X ray, diagnosed the condition, and ordered medications and monitoring while staff scheduled the orthopedic consultation. As soon as Dr. Mullins became aware of a possibility of delay caused

7

by the orthopedic specialist, Dr. Mullins intervened to get the surgery completed at a hospital. To the extent Plaintiff asserts negligence or disagrees with Dr. Mullins' or Nurse Scott's medical judgment, such claims are not actionable via § 1983. See, e.g., Estelle, 429 U.S. at 105-06; Sosebee v. Murphy, 797 F.2d 179, 181 (4th Cir. 1986); Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).

While Plaintiff complains that he received only "Tylenol" for pain and denied medications on May 25 and May 26, the evidence establishes that Plaintiff was prescribed and received Tylenol #3 – a narcotic pain reliever – and prescription strength Ibuprofen to avoid a narcotic dependency. See, e.g., Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996) ("Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations."). The evidence establishes that Nurse Scott administered pain medications, including the narcotic medication, as prescribed. Nurse Scott did not give pills to Plaintiff on two occasions because Plaintiff's medical records indicated to Nurse Scott that it was too soon since his last dose. On both occasions, Nurse Scott gave the pills to Plaintiff later in the shift when it could be administered safely. Plaintiff may have desired more frequent narcotics at a higher dosage, but Nurse Scott is not permitted to administer medications more frequently than what is ordered by the physician.

I find that Plaintiff has not established either defendant's deliberate indifference and that none of Defendants' acts or omissions were so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. Accordingly, Defendants are entitled to qualified immunity and summary judgment.

8

## III.

For the foregoing reasons, I grant Defendants' motion for summary judgment. I also deny Plaintiff's motion for default judgment as meritless.

**ENTER:** This 9th day of August, 2016.

*/s/ Jackson L. Kiser*
Senior United States District Judge